| | | |
|---|---|---|
| Harvey Dozier, | ) | C/A No.: 1:09-1605-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff ("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. §§ 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards.

I.      Relevant Background

    A.      Procedural History

Plaintiff filed his application for DIB on April 25, 2005, alleging a disability onset date of March 29, 2005. The application was initially denied on August 24, 2005, and upon reconsideration on January 6, 2006. Plaintiff filed a timely request for hearing on January 18, 2006. At a March 6, 2007 hearing, Administrative Law Judge ("ALJ")

Gregory M. Wilson heard testimony from Plaintiff and Vocational Expert ("VE") Luther D. Pearsall, Ph.D. Plaintiff's counsel, David Hood, was present at that hearing. On September 27, 2007, the ALJ issued a partially-favorable decision on Plaintiff's application for benefits, which the Appeals Council upheld. Plaintiff filed this appeal, requesting reversal of the prior determinations of the Commissioner and a remand for an award of benefits or, in the alternative, additional administrative proceedings.

B.    Plaintiff's Background and Medical History

Born February 16, 1953, Plaintiff was 52 as of his March 29, 2005, his alleged onset date. He was 54 years old as of September 1, 2007, the date the ALJ found his disability began. Tr. 60. He attended school through the ninth or tenth grade and has past relevant work as a log tractor operator and a logger. Tr. 303, 323, 124.[1]

1.    Medical Evidence

Plaintiff has not disputed the Commissioner's recitation of her medical history set out in the Commissioner's Memorandum. *See* Entry #15. Therefore, the undisputed medical evidence as stated by the Commissioner is set forth herein.

a.    St. James-Santee Family Health Center

From January 2004 to June 2007, Alfred Daniels, M.D., and other providers at St. James-Santee Family Health Center treated Plaintiff for various problems. From January 2004 to December 2005, they treated Plaintiff with medication for a fungal infection of

---

[1] At the hearing, Plaintiff testified he went to school through the ninth grade. Tr. 303. His school records include grades for the tenth grade, as well. Tr. 124.

the feet, diabetes mellitus, diabetic neuropathy, asthma, low back pain without trauma or muscle spasm, and pain in the feet, shoulders, right leg, and left knee. Tr. 163–76. In January 2006, Plaintiff received treatment for acute bronchitis and diabetes. Tr. 244–45. In February 2006, he complained of pain in the back hip, left wrist, torso, and legs. Tr. 244–45. The provider's notes indicated complaints of back pain and impressions of bilateral sciatica and probable chronic obstructive pulmonary disease (COPD) in March 2006. Tr. 242. In April 2006, Plaintiff complained of a burning sensation and fungus in his feet and was diagnosed with athlete's foot. Tr. 240. Plaintiff also complained of swelling of his feet in an April 2006 visit, but Dr. Daniels observed no obvious swelling during his examination. Tr. 239. Plaintiff complained of back pain, sinus problems, and foot problems in July 2005. Tr. 237. Dr. Daniels found Plaintiff had a negative straight leg raising test and reduced range of motion and diagnosed possible spinal stenosis, possible COPD, poorly controlled diabetes, tinea pedis, and high cholesterol. Tr. 233–37. In November 2006, Dr. Daniels noted that Plaintiff had poorly controlled diabetes and tinea pedis. Tr. 229–30.

In January 2007, Dr. Daniels prescribed medication for recurrent gout. Tr. 225. In March 2007, Plaintiff received treatment for diabetes, COPD, and pneumonia. Tr. 248. In April 2007, he complained of knee pain, vision problems, and breathing problems. Tr. 249. In June 2007, Dr. Daniel's notes indicate Plaintiff's diabetes was poorly-controlled. Tr. 250.

On February 8, 2007, Dr. Daniels reported that Plaintiff suffered from mild pain because of chronic low back pain, which resulted in Plaintiff's being able to stand for five minutes and sit for thirty minutes at a time, lift twenty pounds occasionally and no weight frequently, and he was not to bend or stoop. Tr. 205–06. He reported Plaintiff's examination findings as including limited motion of the spine, motor loss, sensory or reflex loss, positive straight leg raising tests, severe burning or painful dysesthesia in the right leg, pseudoclaudication, chronic nonradicular pain and weakness, and inability to ambulate effectively. Tr. 205. He stated that Plaintiff was unable to tolerate exposure to dust, smoke, and fumes due to moderately persistent asthma, and was limited to occasional balancing because of poorly controlled diabetes mellitus. Tr. 207–10. Dr. Daniels also stated that Plaintiff was limited to working two hours per day. Tr. 205.

b.     Doctor's Care Georgetown

Between May 2006 and September 2006, Plaintiff was treated with medications at Doctor's Care Georgetown for athlete's foot, pneumonia, and acute exacerbation of COPD. Tr. 185–204. In December 2005, January 2006, April 2006, October 2006, and December 2006, his chest x-rays showed no abnormalities. Tr. 211–17. In June 2006, a chest x-ray taken showed poor inspiration and diffuse interstitial lung markings. Tr. 213. A March 30, 2006 MRI scan of Plaintiff's lumbar spine showed well-maintained disc spaces and a small central disc protrusion at L5-S1. Tr. 215. In May and June of 2007, Plaintiff was treated for sinusitis. Tr. 263–65. In July 2007, he was treated for an upper

respiratory infection.  Tr. 267.  In August 2007, he was treated for allergic rhinitis.  Tr. 263–65, 267, 275.

<ul style="list-style:none">
<li>c.     Other Medical Evidence</li>
</ul>

James E. Turek, M.D., examined Plaintiff at the request of the Commissioner on July 19, 2005.  Tr. 147–50.  Plaintiff related a history of gradually increasing back and joint pain, pain and swelling in his right foot, diabetes, and asthma. Tr. 147.  He denied a history of in-patient or emergency treatment for asthma and said his asthma was not a day-to-day problem. Tr. 147. Dr. Turek found Plaintiff had coordinated gait, good range of motion in the upper and lower extremities, intact joints, and no muscle weakness or atrophy.  Tr. 149. He diagnosed gouty arthritis, low back pain due to arthritis, mechanical low back pain, and adult-onset diabetes mellitus. Tr. 149.  Dr. Turek stated that Plaintiff appeared to be limited by arthralgias and would benefit from treatment for his "chronic gouty symptoms."  Tr. 149.

Charles T. Fitts, M.D., assessed Plaintiff's residual functional capacity ("RFC") at the request of the Commissioner on August 23, 2005.  Tr. 151–58.  Dr. Fitts found Plaintiff could lift twenty pounds occasionally and ten pounds frequently, could sit for six hours and stand/walk for six hours in an eight-hour day, and had some postural limitations.  Tr. 152–53.  He further found that Plaintiff's gouty arthritis was a severe impairment, but that his asthma and diabetes were not severe impairments. Tr. 161. In an undated RFC assessment, another state agency medical consultant found Plaintiff could lift twenty pounds occasionally and ten pounds frequently, sit for six hours and

stand/walk for six hours in an eight-hour day, never balance, and occasionally climb, stoop, kneel, crouch, and crawl. Tr. 177–83.

On August 24, 2007, Plaintiff was admitted to Georgetown Memorial Hospital with complaints of chest pain. Tr. 252. Tests indicated that his cardiac enzymes, liver function studies, chest x-ray, and CT scan of the chest were normal. Tr. 252–57. He was diagnosed with atypical chest pain and discharged the following day. Tr. 252.

2.      School Records

Georgetown County School District records indicate that Plaintiff attended school through the tenth grade. These records also indicate results on intelligence tests yielded IQ scores of 63 in 1966 and 69 in 1968. Tr. 123–26.

3.      Testimony

At the hearing on March 6, 2007, Plaintiff testified that he could read "just a little" and write "pretty good." Tr. 303. He testified that he last worked as a tractor driver and load operator, which involved driving a tractor, lifting 50 to 60 pounds, some walking, some standing, and a lot of sitting, bending, and stooping. Tr. 304–06. He testified that after he stopped working in March 2005, he filed a claim for unemployment compensation benefits and received benefits for about eight weeks. Tr. 304. He testified that he was unable to perform any job he held in the past because of diabetes and gout, and that gout made his foot swell. Tr. 306. He testified that he injured his lower back 12 or 13 years ago and that his back pain started to worsen about two-and-a-half years ago. Tr. 315.

He testified he could not be around dust, smoke, or fumes because of his asthma. Tr. 307.

He also testified that he could hardly see anything at night and sometimes had difficulty

seeing during the day, but that he did not have eyeglasses. Tr. 307. He testified that he

took medication for asthma, gout, and back pain. Tr. 313–16. He testified that he took a

nap and elevated his legs for about two hours a day. Tr. 307. He testified he could stand

for about 15 minutes, sit for about 30 minutes, and walk about a half a block. Tr. 308. He

testified he had trouble sleeping and could not lift anything because of his foot and back,

and had memory problems because of diabetes. Tr. 308–09. He testified that he had been

taking Amitriptyline (Elavil) for depression for about a year and that it made him feel

drowsy. Tr. 309–10.

When asked about his daily activities, Plaintiff testified that he took out the trash,

drove 12 or 13 miles per week, went to the grocery store, and went to church, but did not

cook, wash dishes, do laundry, sweep, vacuum, clean, or do yard work. Tr. 317–20.

When asked what activities he and his minor daughter did together, he replied, "[j]ust

read." Tr. 320.

### 4. VE Testimony

At the request of the ALJ, VE Dickson Pearsall, Ph.D. testified that Plaintiff's past

job as a log tractor operator was medium work with an SVP of 4, and that his past job as a

logger was heavy work with an SVP of 4. Tr. 323. He testified that Plaintiff had

transferable skills from his log-tractor-driver job to other medium jobs, but that he did not

have transferable skills to light or sedentary work. Tr. 323. The ALJ asked Dr. Pearsall to

consider a person of Plaintiff's age, education, and work experience who could lift 20 pounds occasionally and 10 pounds frequently; stand for six hours, walk for six hours, and sit for six hours in an eight-hour day; occasionally push/pull with the lower extremities, climb, balance, stoop, kneel, crouch, and crawl; and never climb ropes, ladders, or scaffolds. Tr. 323–24. Dr. Pearsall testified that such a person could work as a grader/sorter, general assembler, parking lot attendant, checker, and convenience store attendant. Tr. 324–25, 329–30. He testified that if the same person required an at-will sit/stand option and had to avoid concentrated exposure to fumes, he could work as a grader/sorter, checker, and convenience store attendant. Tr. 325, 330.

### 5. Dr. Pearsall's Report

On August 27, 2007, which was several months after the March 2007 hearing but before the ALJ issued his decision, Dr. Pearsall, who had been the testifying VE, performed an Intellectual and Academic Assessment of Plaintiff at the request of Plaintiff's counsel. Tr. 336–37. Based on Plaintiff's results on the Kaufman Brief Intelligence Test, Dr. Pearsall found Plaintiff had a full-scale IQ of 62 and second-grade reading and math skills, and that his results were "clinically supportive of actual and functional illiteracy." Tr. 337. Dr. Pearsall stated that "[i]n combination with difficulty with adaptive functioning, such IQ results would support a clinical determination of mental retardation," and that he had no doubt Plaintiff met the criteria for mental retardation at the time of his opinion and when he was in high school. Tr. 337. Dr. Pearsall further stated that if Plaintiff had the limitations that Dr. Daniels reported in

February 2007 in addition to the intellectual limitations he (Dr. Pearsall) had found, there would be no work Plaintiff could perform. Tr. 337.

After the ALJ issued his decision, Plaintiff submitted a statement by Dr. Pearsall, dated May 3, 2008, to the Appeals Council. Tr. 280–81. Dr. Pearsall explained that, in his September 2007 decision, the ALJ "incorrectly states that [Dr. Pearsall] opined that [Plaintiff]'suffers from mental retardation.'" Tr. 280. His letter explains that Plaintiff's IQ scores from the 1960s "provide very strong clinical evidence of 'mental retardation[]'" and that the August 2007 IQ test score indicates Plaintiff's "intellectual capacity has not increased since 1968." Tr. 280.

Dr. Pearsall also pointed out other inconsistencies he believed to exist in the ALJ's decision. He stated that Plaintiff had not performed skilled work as a heavy equipment operator, as the ALJ found, but rather worked as a logging tractor operator, which was semi-skilled work. Tr. 281. He stated Plaintiff did not testify that he lived alone, but that Plaintiff lived "with his long term fiancée who is the mother of his child[.]" Tr. 281. Dr. Pearsall also stated that "the capacity to receive mail or prescriptions from a doctor has no impact regarding classification of mental retardation." Tr. 281.

6.  The ALJ's Decision

At the first step of the sequential evaluation, the ALJ found Plaintiff had not worked since March 29, 2005, his alleged date of onset of disability. Tr. 20. At step two, he found Plaintiff's "severe" impairments consisted of diabetes mellitus, gout, asthma, vision problems, and degenerative disc disease. Tr. 20. At the third step, the ALJ found

Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Tr. 22. He then found Plaintiff had the RFC to perform a significant range of light work activity. Specifically, the claimant was able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day with an at will sit/stand option. The claimant can occasionally push and pull with his lower extremities, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but can never climb ropes, scaffolds, or ladders and must avoid concentrated exposure to fumes. Tr. 23. At step four, the ALJ found Plaintiff could not perform his past relevant work. Tr. 29. At step five, based on the testimony of VE Pearsall, the ALJ found Plaintiff could work as a grader/sorter, parking lot attendant, and checker prior to September 1, 2007, when he found Plaintiff attained "advanced age," i.e., age 55. Although Plaintiff did not actually reach the age of 55 until February 16, 2008, (Tr. 60), the ALJ found he reached "advanced age" for purposes of the Medical-Vocational Guidelines (sometimes referred to as "the Grids") as of September 1, 1007, to avoid mechanical application of the Grids. Tr. 29–30. The ALJ then found the Grids directed a finding of "disabled" for a person of advanced age with Plaintiff's education and past work experience. Tr. 29–30. Therefore, the ALJ determined that Plaintiff became disabled on September 1, 2007, but that he was not disabled before that date. Tr. 30. Plaintiff appeals the portion of the ALJ's decision that found he was not disabled prior to September 1, 2007.

II.    Discussion

In his brief, Plaintiff argues that the Commissioner's findings are in error for the following reasons:

1) The ALJ erred by not finding that Plaintiff satisfied the requirements for Listing 12.05C;

2) Plaintiff's illiteracy required a finding of disability pursuant to Rule 202.09 of the Medical-Vocational Guidelines; and

3) the ALJ did not afford proper deference to the opinion of Plaintiff's treating physician, Dr. Alfred Daniels.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ's decision is free from error.

A.    ALJ Findings

In his September 27, 2007 decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since March 29, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.The claimant has the following severe impairments: diabetes mellitus, gout, asthma, vision problems, and degenerative disc disease (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a significant range of light work activity. Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day with an at will sit/stand option. The claimant can occasionally push and pull with his lower extremities, climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but can never climb ropes, scaffolds, or ladders, and must avoid concentrated exposure to fumes. Such a residual functional capacity is well supported by the weight of the evidence of record.

6. As a result of his residual functional capacity as described above, the claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was 52 years old on the alleged onset date of disability. This is defined in the regulations as an individual closely approaching advanced age. On September 1, 2007, the claimant was 54years old. However; for the purposes of this decision, he is found to be of advanced age as of that date. (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Prior to September 1, 2007, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Beginning on September 1,2007, the claimant has not been able to transfer any job skills to other occupations (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Prior to September 1, 2007, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. Beginning on September 1, 2007, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c) and 404.1566).

12. The claimant was not disabled prior to September 1, 2007, but became disabled on that date and bas continued to be disabled through the date of this decision (20 CFR 404.1520(g)).

Tr. 20–23, 29–30.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding

disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to past relevant work, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to past relevant work. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine

whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); s*ee Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

      1.     The ALJ Did Not Adequately Evaluate Whether Plaintiff Satisfied Listing 12.05C.

Plaintiff first contends that the ALJ failed to recognize that medical evidence established the presence of a disabling mental impairment listed in section 12.05C of Appendix 1 to 20 C.F.R. § 404, Subpart P ("the Listings"). Listing 12.05 states in relevant part:

> 12.05 Mental Retardation and Autism: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22) . . . The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitations of function;
> . . .

20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05.

Under Section 12.05C, which is at issue here, a claimant's IQ score must come within the listed range of 60 to 69 inclusive, and second, he must be able to demonstrate an additional significant limitation.

The Commissioner argues that, in addition to satisfying the IQ-score requirement and the requirement of showing a "physical or other mental impairment imposing additional and significant work-related limitations of function," a claimant must also satisfy the diagnostic description in the introductory paragraph of Listing 12.00. As quoted above, that introductory paragraph states mental retardation "refers to a significantly subaverage general intellectual functioning with deficits in adaptive

behavior . . . ." 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05. Plaintiff does not sharply focus on this legal issue. However, he quotes only the requirements of an IQ score of 60 through 70 and another physical or mental impairment as being the only two things he must prove to establish he meets Listing 12.05C. Pl.'s Br. 17–18.

Although the Fourth Circuit has not directly considered whether the "deficits-in-adaptive-behavior" language in the preamble to Listing 12.00 is an additional point a claimant must establish to satisfy one of the Listings in 12.00, circuits that have considered the issue seem uniformly to find that a claimant must establish both the diagnostic portion of the introductory paragraph in addition to one of the severity indicators, delineated in subsections A - D. *See, e.g., Randall v. Astrue*, 570 F.3d 651, 657–59 (5th Cir. 2009) (collecting cases).

Based on the seemingly uniform position of the circuits, and in the absence of contrary guidance from the Fourth Circuit, here, Plaintiff here must establish "deficits in adaptive functioning that manifested during the developmental period" in addition to the IQ-score requirement and the presence of another impairment "imposing additional and significant work-related limitations or function" to establish that he meets Listing 12.05C.

Here, the ALJ never mentioned Listing 12.05C by name, nor did he list the elements Plaintiff needed to prove to satisfy that Listing. Rather, he noted that Plaintiff "was diagnosed with mental retardation following a consultative examination at the request of his attorney[]" and noted that Plaintiff's IQ score from testing during that August 28, 2007 was 68. He further acknowledged that Plaintiff's school records indicated a "full-scale IQ score of 63 in 1966 and a full scale IQ score of 69 in 1968 (8th

grade)." Tr. 21. He continues with additional discussion of Plaintiff's claimed "mental retardation," as follows:

> Dr. Pearsall opined that the claimant suffered from mental retardation and was illiterate. See Exhibit 11 F. However, the undersigned notes that school reports indicate that the **claimant had a 10th grade education**. See Exhibit 14E. Despite his mental condition, the claimant testified that he was **able to live alone and care for his minor child, who also lived with him**. Treatment notes indicate that the claimant was **able to receive mail and prescriptions from his doctors**. See Exhibit 10F and Exhibit 11F. Notably, the **claimant has past work activity as a heavy equipment operator, which is skilled in nature with a SVP of 6**. See DOT # 859.683-010. The claimant has also reported that **he was able to shop, visit with friends, and drive**. Finally, the undersigned notes that the claimant has a past work activity as a heavy equipment operator, which is described as skilled work, with a SVP of 6. See DOT # 859.683-010. Therefore, following a thorough review of the evidence of record, the **undersigned finds that such lowered IQ scores fail to reflect the claimant's functional level and fail to indicate any deficits in adaptive functioning (as required for a diagnosis of mental retardation)**.

Tr. 21(emphasis added).

The ALJ's discussion quoted above suggests the ALJ may have been considering whether Plaintiff satisfied Listing 12.05C. However, he never discussed whether Plaintiff satisfied the requirements of Listing 12.05C at all. Further, in a separate section of his decision, the ALJ explains which of the Listings he considered in evaluating Plaintiff's disability claim, yet Listing 12.05 is not among them. *See* Tr. 22 (ALJ's making his required step-three finding and stating Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the Listed Impairments . . . ."). In discussing that finding, however, the ALJ indicates that he "specifically considered Listings 1.00, 2.00, 3.00, and 9.00." Tr. 22.

The court finds that the ALJ's failure to expressly consider and discuss his findings regarding whether Plaintiff satisfies Listing 12.05C would be sufficient reason to require remand for the ALJ to properly consider the issue. Nonetheless, the ALJ discussed Plaintiff's IQ scores and set out specific reasons he found Plaintiff's "lowered IQ scores fail to reflect the claimant's functional level" and suggested that these same reasons did not indicate "deficits in adaptive functioning (as required for a diagnosis of mental retardation)." Tr. 21. The court will address those reasons in light of applicable law and the record evidence.

The record undisputedly contains evidence that Plaintiff's IQ scores in school were 63 and 69 and that his IQ score as of August 27, 2007 was 62. Tr. 123–26 (school records); Tr. 336–37 (2007 Assessment by Dr. Pearsall).[2]

---

[2]Dr. Pearsall's report provided, in pertinent part:
The KBIT [IQ test] utilizes composite subscores to provide a full range intelligence quotient (IQ). [Plaintiff] has a full scale intelligence quotient of 62. Such testing is indicative of significantly below average intellectual functioning. In combination with difficulty in adaptive functioning, such IQ results would support a clinical determination of mental retardation. A categorization of mental retardation requires that presentation must occur during the development period (0-18 years, up to 21 years in certain circumstances). Such presentation is clearly evidenced in Mr. Dozier's school records. Mr. Dozier had a 53 full scale IQ in 1966 (6th grade) and a 69 full scale IQ in the 8th grade. I have no doubt that Mr. Dozier met the criteria for a diagnosis of 'mental retardation' while in public education. I am confident, based on results of current testing, that he continues to meet the criteria for 'mental retardation'.
Tr. 337.

In conjunction with their discussion of the ALJ's analysis, both parties discuss a letter from Dr. Pearsall that Plaintiff presented to the Appeals Council in which Dr. Pearsall points out several alleged inaccuracies in the ALJ decision. Tr. 281–82, Pl.'s Br. 19–20, Def.'s Br. 12–13. The Appeals Council acknowledged receipt and review of the information and indicated it "found that this information does not provide a basis for changing the Administrate Law Judge's decision." Tr. 7–10. In reviewing the letter and the parties' arguments, the court is mindful of *Harmon v. Apfel*, 103 F. Supp. 2d 869, 873 (D.S.C. 2000). *Harmon* and other cases provide that when "new and material" additional evidence is presented to the Appeals Council, but the Appeals Council does not provide reasons the additional information did not change the ALJ's decision, remand is necessary so that appropriate review could take place.

Here, though, Plaintiff did not raise this issue on appeal, and the court will not fully analyze that issue sua sponte. The court notes, though, that the information in Dr. Pearsall's May 3, 2008 letter is not really "new evidence." Rather, it contains argument that Plaintiff presented in his brief that, for the most part, did not require any evidence such as the letter to support the argument. (For example, Dr. Pearsall points out the ALJ's error in stating Plaintiff's prior work was a "skilled" position. Simple review of the transcript reveals that error, as well.) Because, as discussed further within, the court finds other issues must be addressed by the ALJ on remand, the ALJ may review this evidence on remand. The court will not further discuss Dr. Pearsall's May 2008 letter here.

The ALJ's role is not to determine whether IQ scores are legitimate. *See Jackson v. Astrue*, 08-2855, 2010 WL 500449, *5 (D.S.C. Feb. 5, 2010) (remanding because ALJ improperly interpreted evidence when he found plaintiff's daily activities did not comport with her IQ scores); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (noting ALJ "not qualified to interpret raw medical data in functional terms[.]"). Whether Plaintiff's IQ scores—which have consistently fallen within the range of Listing 12.05c's first requirement—are consistent with his driving or "receiving mail and prescriptions from his doctors" is not a decision the ALJ was entitled to make.

Although the regulations permit consideration of evidence in addition to the number of an IQ score, general discussion of activities and an ALJ's intuition are not sufficient to overcome medical evidence. The ALJ cannot substitute his own judgment and disregard IQ tests. He may, however, conduct an appropriate inquiry into Plaintiff's activities in considering Plaintiff's adaptive functioning. On remand, the ALJ should expressly consider the evidence in light of the demands of the Listing and, if necessary, reopen the record to inquire further regarding Plaintiff's ability to function.

For example, the ALJ mentions that Plaintiff completed the tenth grade in his discussion of whether Plaintiff has deficits in adaptive function. Tr. 21. Although it is accurate that Plaintiff went to school through the tenth grade, the ALJ has not explained how that information relates to the findings necessary to determine whether Plaintiff met Listing 12.05C. The ALJ also characterized Plaintiff's activities of shopping, visiting with friends, and driving as reasons Plaintiff's IQ scores were not reflective of his abilities. Tr. 21. Review of his testimony indicates Plaintiff admitted he went to the

grocery store and visited with friends, "[i]f they c[a]me to [his] house." Tr. 319–20.

Plaintiff indicated he could not drive at night, and drove approximately twice a week during the day. Tr. 307, 318. In any event, there is no obvious link between mental functioning and shopping or visiting with friends. On remand, ALJ should explain how these activities and others impact his analysis of Plaintiff's claim that he meets Listing 12.05C. Additionally, the Commissioner concedes that the ALJ's finding that Plaintiff "was able to live alone and care for his minor child, who also lived with him," was incorrect. Def.'s Br. 12. The ALJ should consider the proper evidence on this, as well.

The undersigned further notes that the ALJ erred when considering Plaintiff's prior work as a reason he did not satisfy Listing 12.05C. The ALJ's decision indicates Plaintiff's prior work was as heavy equipment operator, a skilled position with an SVP of 5. Tr. 21. The Commissioner has conceded that the ALJ was mistaken and that Plaintiff's prior work was semi-skilled. *See* Def.'s Br. 12–13. However, the Commissioner may not rely on a claimant's prior work history to show non-disability when the Listing criteria are met. "When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap." *Murphy v. Bowen,* 810 F.2d 433, 438 (4th Cir. 1987) *(cited in Luckey v. U.S. Dept. of Health & Human Serv's,* 890 F.2d 668–69, (4th Cir. 1989)).

On remand, the ALJ must make a specific finding regarding Listing 12.05C's other requirement—that a claimant have a physical or other mental impairment imposing additional and significant work-related limitation of function. The Fourth Circuit follows the rule that "if a claimant cannot return to his past relevant work, he has established a

work-related limitation of function which meets the requirements of § 12.05(C)." *Flowers v. U.S. Dept. of Health & Human Services*, 904 F.2d 211, 214 (4th Cir. 1990) (internal citation omitted). "Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities." *Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666, 669 (4th Cir. 1989) (citing 20 C.F.R. §§ 404.1520(c), 1521(a) (1988)).

Here, the ALJ determined that Plaintiff had several "severe" impairments and that he was unable to return to his past work. Tr. 20, 29. Those findings have not been appealed. On remand, the ALJ should consider this portion of Listing 12.05C's requirements to be satisfied.

> 2. The ALJ Did Not Err by Finding Plaintiff Had a "Limited Education," and Applying Rule 202.09 of the Medical Vocational Guidelines (the "Grids").

Plaintiff next claims that, even if he is not found disabled under Listing 12.05C, he should be found disabled beginning on March 29, 2005, his alleged onset date, based on his claimed illiteracy pursuant to Rule 202.09 of the Medical-Vocational Guidelines ("the Grids"). The ALJ may use the Grids at step five of the sequential evaluation in determining whether jobs exist that a claimant can perform, when the claimant's "impairment(s) prevents the performance of his or her vocationally relevant past work." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00. The Grids consider a person's age, education, work experience, and RFC.

Here, the ALJ found Plaintiff could no longer perform his past relevant work at step four. Tr. 29. At step five, the ALJ consulted the Grids and found that, prior to September 1, 2007, Plaintiff could perform "the full range of light" work, and considering that RFC, along with his age (under 55) and his education level (limited), the Grids indicated a finding of "not disabled." *See* Tr. 30 (*citing* Medical-Vocational Rule 202.11).

Plaintiff alleges the ALJ erred in this portion of his analysis when he considered Plaintiff to have "limited education," as opposed to being "illiterate." Plaintiff and the Commissioner agree that the Grids indicate a finding of disability for an individual with the same classifications the ALJ made for other categories, but who is illiterate. *See* Def.'s Br. 13–14. The parties disagree, though, on whether the ALJ should have classified Plaintiff as "illiterate" for purposes of consideration under the Grids.

Plaintiff relies on Dr. Pearsall's August 2007 report, specifically the following findings regarding Plaintiff's reading abilities:

> The KBIT [intelligence test Pearsall gave Plaintiff] assesses sight word recognition and basic reading. [Plaintiff] scored at the less than 10th percentile on all reading components. Effectively, [Plaintiff] can not read. He tested at less than second grade level. Such limited reading capacity is clinically supportive of actual and functional illiteracy.

Tr. 337. Plaintiff cites to no law, but argues that Dr. Pearsall's findings are not contradicted in the record and reiterates his argument that the ALJ erred in finding he "enjoyed reading" as being unsupported in the record (as discussed more fully above in connection with the Listing 12.05 discussion).

The Commissioner counters that Plaintiff simply does not satisfy the regulation's definition of illiteracy. The court agrees.

"Illiteracy means the inability to read or write." 20 C.F.R. § 404.1564(b)(1). A claimant is illiterate if he or she "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *Id.* "Generally, an illiterate person has had little or no formal schooling." *Id.*

When questioned by the ALJ, Plaintiff testified that he could read "just a little" and write "pretty good." Tr. 303. His past relevant work had been semi-skilled work, he could drive, and he completed the 10th grade. Tr. 123–26.

The Commissioner argues that Plaintiff's abilities are consistent with the regulation's definition of one with a "limited education," as the ALJ found in his decision. The regulations define a "limited education" generally as formal education from 7th through 11th grade. 20 C.F.R. § 404.1564(b)(3). Alternatively, the Commissioner argues that Plaintiff would at least be considered to have a "marginal education," which is between being "illiterate" and having "limited education" and is considered to be one at a 6th grade level or less. 20 C.F.R. § 404.1564(b)(2). Even if the ALJ had considered Plaintiff to have a "marginal education," the Grids would not direct a finding of disability.

The court agrees with the Commissioner that Dr. Pearsall's opinion that Plaintiff's ability to read was "clinically supportive of actual and functional illiteracy" (Tr. 337), did not establish "illiteracy" under the Commissioner's regulations. The ALJ did not err by finding Plaintiff had a "limited education" for purposes of utilizing the Grids to establish his ability to do work. This allegation of error is without merit.

3.  The ALJ Appropriately Considered the Opinion of Plaintiff's Treating Physician.

Plaintiff's final claim is that the ALJ erred by not giving appropriate weight to the opinion of his treating physician, Dr. Alfred Daniels. Pl.'s Br. 26–35. The Commissioner counters that the ALJ appropriately considered and discounted portions of Dr. Daniels' opinion and that the ALJ properly explained and documented the reasons for his findings relating to that opinion. Def.'s Br.15–16.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6). However, determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance").

The Fourth Circuit has set forth the following considerations for an ALJ when weighing and evaluating medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001)). An ALJ, though, can give a treating physician's opinion less weight "in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court remains mindful that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

Plaintiff's treating physician, Dr. Daniels, provided an assessment of Plaintiff on February 8, 2007. Tr. 205. Regarding Plaintiff's allegations of low back pain, he found the following after examining Plaintiff: neuro-anatomic distribution of pain; limitation of motion of the spine; motor loss; sensory or reflex loss; positive straight leg raise; severe burning or painful dysesthesias (R); pseudoclaudication; chronic non-radicular pain and weakness; inability to ambulate effectively, (explained on form as "e.g. inability to walk a

block at a reasonable pace on rough or uneven surface, inability to walk enough to shop or bank, or inability to climb a few steps at a reasonable pace with the use of a single handrail"). He indicated Plaintiff suffered from "mild" pain and that he should observe the following restrictions: standing at one time should be limited to 15 minutes; sitting at one time should be limited to 30 minutes; Plaintiff could work 2 hours per day; he could lift 20 pounds occasionally and nothing frequently; and he should not bend or stoop. Tr. 205.

The ALJ recited the appropriate standard and controlling case law for considering a treating physician's opinion, but found that "[a]fter a thorough review of the evidence of record, the undersigned has determined it proper to exercise his discretion to give less than controlling weight to the testimony of claimant's treating physician (specifically Dr. Alfred Daniels), as a result of persuasive contrary evidence, as supported by 20 CFR §404.1527(d)(2); §416.927(d)(2); Social Security Ruling 96-2p; *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996); and *Hunter*, 993 F.2d at 35." Tr. 26.

After setting out the Dr. Daniels' findings from the February 8, 2007 evaluation, the ALJ indicated he "accord[ed] these medical opinions minimal weight as they are **generally unsupported by the weight of the evidence of record**, including Dr. Daniel's [sic] own treatment notes." Tr. 26 (emphasis added). Plaintiff argues that the ALJ erred because he "indicated he was rejecting Dr. Daniel's [sic] opinion because it was 'not supported' by the other evidence of record." Pl.'s Br. 28. Plaintiff argues this "unsupported by the weight of evidence" standard is improperly more demanding that the proper "not inconsistent with" standard.

On its face, the ALJ's stating the weight of the evidence does not support Dr. Daniels' opinion would require too much. Instead, the ALJ is to honor as controlling a treating physician's opinion so long as it is "not inconsistent" with other substantial evidence. *See, e.g., Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1100-01 (E.D. Wis. 2001) (noting the "'not inconsistent' standard presumes the [treating physician's] opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating source's opinion less than controlling weight[,]" as opposed to an ALJ's only giving a treating source's opinion controlling weight if "the record supports it.").

That stated, though, the court must analyze the ALJ's actual analysis of Dr. Daniels' opinion to determine whether error was committed. The court finds that the ALJ did appropriately consider Dr. Daniels' opinion but gave it "minimal weight" for appropriate reasons. The ALJ examined the record, including Dr. Daniels' treatment records. He found Dr. Daniels' treating records were inconsistent with the functional limitations Dr. Daniels set out in his evaluation. *See* Tr. 26–29.

In considering Plaintiff's RFC, he provided detailed discussion of Plaintiff's claimed impairments and the medical records of Dr. James and other providers in discussing the impairments and their impact on Plaintiff's ability to work. *Id.* The court is satisfied that the ALJ appropriately considered Dr. James' findings and treatment notes.

In addition to detailed review of Dr. James' treatment notes, the ALJ also discussed other doctors' findings that he considered inconsistent with Dr. James' opinion. For example, he considered Dr. Turek's July 2005 examination report, which included

findings of coordinated gait, good range of motion in the upper and lower extremities, intact joints, no edema or swelling, and no muscle weakness or atrophy. Tr. 27–28, 149. These findings were inconsistent with Dr. Daniels' statements that Plaintiff had motor loss, chronic weakness, and inability to ambulate effectively. *See* Tr. 205. The Commissioner may give greater weight to the report of an examining physician than to the report of a treating physician when the former more accurately reflects the claimant's condition. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993). The ALJ did not err in giving "minimal weight" to Dr. Daniels' opinion in light of its inconsistency with other medical opinion evidence. Tr. 26.

The ALJ also discussed the opinion of two state agency physicians who both independently opined Plaintiff was not disabled, finding he could lift 20 pounds occasionally and 10 pounds frequently, sit for six hours, and stand/walk for six hours in an eight-hour day. Tr. 26, 151–58, 177–83. As noted by the ALJ, those opinions were inconsistent with Dr. Daniels' opinion that Plaintiff was unable to work for more than two hours per day, could not lift any weight frequently, and could not ambulate effectively. Tr. 26. The Commissioner may rely on testimony of a non-examining, non-treating physician when it is consistent with the record. *See Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Further, the ALJ did not "reject" Dr. James' opinion outright, as Plaintiff argues. Pl.'s Br. 30. Rather, in discussing Plaintiff's impairments and considering his RFC, the ALJ considers evidence in Dr. James' records and bases some of the limitations to Plaintiff's RFC on these conditions. *See* Tr. 27–29.

The court finds that the ALJ appropriately considered and discounted Dr. James' opinion because he found it to be inconsistent with substantial record evidence. This allegation of error is without merit.

III.    Conclusion and Recommendation

Based upon the foregoing, the court cannot conclude that the ALJ's decision to deny benefits prior to September 1, 2007 was supported by substantial evidence. Therefore, it is recommended that the Commissioner's decision be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for additional consideration as set out herein.

IT IS SO RECOMMENDED.

July 30, 2010                                    Shiva V. Hodges
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**